IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
April 26, 2016 Session


**STATE OF TENNESSEE v. BENDALE ROMERO**


**Appeal from the Criminal Court for Knox County**
**No. 102466      Steven Wayne Sword, Judge**

_____


**No. E2015-00860-CCA-R3-CD – Filed June 15, 2016**

_____


Bendale Romero ("the Defendant") stands convicted of attempted first degree murder, employing a firearm during the commission of a dangerous felony, and aggravated assault for the August 10, 2013 shooting of Nathan Kelso. The Defendant, along with his co-defendant, Joshua Johnson, were tried jointly but have pursued separate appeals in this court. On appeal, the Defendant argues that the trial court erred when (1) it allowed the jury to hear a 911 call under the excited utterance exception to the hearsay rule and (2) it ruled that, if the Defendant called a witness to testify that the victim had been the first aggressor in the past, the State could use a portion of the 911 tape, previously excluded by the trial court, in which the caller stated that he knew the shooter because he was the person who shot him in the eye last year. Upon review, we affirm the judgments of the trial court.


**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Joseph Fanduzz, Knoxville, Tennessee, for the appellant, Bendale Romero.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin Ball, Senior Counsel; Charme Allen, District Attorney General; and TaKisha Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## I. Factual and Procedural Background

On August 10, 2013, Nathan Kelso drove to Lonsdale Homes in Knoxville for the purpose of exchanging marijuana for crack cocaine. When he arrived at Lonsdale Homes, he saw "the boy Josh," later identified as Joshua Johnson, pointing a gun at two unidentified individuals. Mr. Kelso waited for their confrontation to conclude, and after it had, he approached Mr. Johnson and said, "I don't know what's going on with you and those guys or whatever, but I need something to, you know, to trade off." Mr. Johnson then turned to Mr. Kelso, said, "[F]— that," and shot him in the leg "for no reason." Mr. Kelso asked, "[W]hat the f— is wrong with you[?]" and held up his arm in a defensive posture. Mr. Johnson then shot Mr. Kelso in the arm, and Mr. Kelso fell to the ground. At that point, Mr. Kelso realized there was a second person with Mr. Johnson, later identified as the Defendant. After Mr. Kelso fell to the ground, he heard Mr. Johnson encourage the Defendant to shoot Mr. Kelso in the head. The Defendant pointed the gun at Mr. Kelso's forehead and pulled the trigger, but the gun did not fire. The Defendant then pushed Mr. Kelso back to the ground, fixed the gun, and shot Mr. Kelso in the head. That bullet also passed through Mr. Kelso's hand. Mr. Kelso reported that Mr. Johnson left in a Camaro driven by the Defendant.

Knoxville Police Department ("KPD") Officer Jacob Wilson responded to a call about a shooting at Lonsdale Homes. When Officer Wilson arrived on the scene, he heard the victim yelling for help. Officer Wilson observed that the victim had bullet wounds to his leg and his left temple. Officer Wilson interviewed the people who were present at the scene and was told that the suspects were driving a maroon, two-door car. After speaking with several residents of the apartment complex, Officer Wilson went to the Defendant's residence to speak to the Defendant. The Defendant's mother answered the door, told Officer Wilson that the Defendant was in his bed, and allowed the officer to check the Defendant's bedroom. The Defendant was not in his bedroom, but his window was open and there was "wet grass all over his bed." Officer Wilson noted that it had been raining on the evening of the shooting. After a search of the property, officers discovered a maroon car hidden in some bushes in the alley behind the Defendant's residence.

The Defendant testified that he went to Lonsdale Homes to visit his cousin on the night of the shooting. There, the Defendant encountered Mr. Kelso, who asked the Defendant to "sell him some." The Defendant refused Mr. Kelso's request and walked toward a trash dumpster. Mr. Kelso followed him and tried to "strong arm [the Defendant] and go in [the Defendant's] pockets." The Defendant tried to push Mr. Kelso away. The Defendant testified his gun fell "off my hip" during the struggle. Once the Defendant was able to free himself from Mr. Kelso, he dove for his gun, pointed it at Mr.

Kelso, and "start[ed] squeezing." The Defendant stated that he was scared and "kind of mad[.]" The Defendant stood up and ran toward his car while continuing to fire his gun in Mr. Kelso's direction. The Defendant then drove away and parked his car behind his residence. He claimed he threw the gun into a creek.

The Defendant reported that Mr. Kelso had tried to bully him for some money one or two weeks before the offense. He said he was not trying to kill Mr. Kelso. On cross-examination, the Defendant said he was not aiming at any particular part of Mr. Kelso's body and he was not aware that he had shot Mr. Kelso. He did not know whether Mr. Kelso pursued him as he ran toward his car. He also admitted that he did not call the police to report that Mr. Kelso tried to rob him. The Defendant also maintained that he was alone and that Mr. Johnson was not present at the shooting.

The jury found the Defendant guilty of attempted first degree murder, attempted first degree murder with serious bodily injury, employing a firearm during the commission of attempted first degree murder, aggravated assault with serious bodily injury, and aggravated assault with a deadly weapon. The trial court merged the attempted first degree murder convictions and the aggravated assault convictions and sentenced the Defendant to an effective sentence of twenty-six years' incarceration. This timely appeal followed.

## II. Analysis

*Admission of 911 Phone Call*

The State introduced five 911 calls from the night of the shooting. In a jury-out hearing, the trial court listened to those calls and held that they were "clearly hearsay" but that they fell under the excited utterance exception to the hearsay rule. The trial court noted that all five of those calls were from people reporting that they had heard gunshots and asking for police assistance. Further, the trial court found that none of the statements were testimonial because they "were not done in preparation for testimony." The trial court further stated that the primary purpose of the questions asked by the 911 dispatcher was to respond to an ongoing emergency and to determine whether anyone had been shot.

Regarding the fifth 911 call, the trial court noted that the caller said, "I know who did it, it's that same guy that shot me in the eye last year." The trial court held that reference to the prior shooting was inadmissible under Tennessee Rule of Evidence 404(b). The trial court found that the call was not clear and convincing evidence of the shooting and that the danger of unfair prejudice outweighed any probative value. As such, the State was not permitted to play the portion of the fifth call that referred to the prior shooting.

The State played a redacted version of the fifth 911 call at trial. In the redacted version, a male caller reported that someone had been shot behind a home on Minnesota Avenue and that he knew the shooter. The dispatcher asked, "So, you actually saw the person that fired the weapon?" and the caller responded, "I heard him shoot the, I heard him shoot him. I—I—I know the dude who shot him." The caller described the shooter as a short, light-skinned, black man who drove a maroon car. When asked which way the shooter went when he left, the caller said, "He lives up there off, he lives on the next street over, his momma's." However, the caller did not know the name of the street where the shooter lived. The dispatcher asked about the location of the victim, and the caller responded, "I don't know, but the dude laying [sic] . . . in the back back here." Later in the call, the caller said, "Man, that dude shot him, and then he begged him not to shoot him, and the dude shot him again." At the end of the call, the caller informed the dispatcher that police had arrived on the scene, and the dispatcher told the caller to tell the officers that he knew who the shooter was.

On appeal, the Defendant argues that the fifth 911 call should not have been admitted under the excited utterance exception to the hearsay rule. Specifically, the Defendant contends that there was insufficient foundation under Tennessee Rule of Evidence 602 to show that the caller had personal knowledge of the identity of the shooter because nothing in the record indicates that the caller saw the shooting or the shooter's flight from the scene. Instead, the caller only said that he heard the shooting and that he knew the identity of the shooter and where he lived. The State argues that the trial court properly determined that the fifth 911 call fell within the excited utterance exception to the hearsay rule. Additionally, the State asserts that the Defendant waived his personal knowledge argument by not objecting to the competency of the declarant at trial. Further, the State contends that declarant had personal knowledge of the facts contained in his statement because he heard the shooting. Finally, the State maintains that any error in admitting the fifth 911 call is harmless because the caller did not identify the Defendant by name and the Defendant admitted that he shot the victim.

Under the Tennessee Rules of Evidence, "hearsay" is any statement, other than one made by the declarant while testifying at trial or in a hearing, offered into evidence to prove the truth of the matter asserted. Tenn. R. Evid. 801. Hearsay statements are not admissible unless they fall within one of the evidentiary exceptions or some other law renders them admissible. Tenn. R. Evid. 802. Our supreme court has recently addressed the standard of review applicable to hearsay statements:

> The standard of review for rulings on hearsay evidence has multiple layers. Initially, the trial court must determine whether the statement is hearsay. If the statement is hearsay, then the trial court must then determine whether the hearsay statement fits within one of the exceptions. To answer these

questions, the trial court may need to receive evidence and hear testimony. When the trial court makes factual findings and credibility determinations in the course of ruling on an evidentiary motion, these factual and credibility findings are binding on a reviewing court unless the evidence in the record preponderates against them. State v. Gilley, 297 S.W.3d [739], 759-61 [(Tenn. Crim. App. 2008)]. Once the trial court has made its factual findings, the next questions—whether the facts prove that the statement (1) was hearsay and (2) fits under one the exceptions to the hearsay rule—are questions of law subject to de novo review. State v. Schiefelbein, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007); Keisling v. Keisling, 196 S.W.3d 703, 721 (Tenn. Ct. App. 2005).

Kendrick v. State, 454 S.W.3d 450, 479 (Tenn. 2015).

"A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" is admissible as an excited utterance. Tenn. R. Evid. 803(2). In order to fall within this exception, there must first be an event or condition that is "sufficiently startling to suspend the normal reflective thought process of the declarant." Kendrick, 454 S.W.3d at 478 (citing State v. Gordon, 952 S.W.2d 817, 820 (Tenn. 1997)). Second, "the statement must 'relate to' the startling event or condition." Id. "A statement relates to a startling event when it describes all or part of the event or condition, or deals with the effect or impact of that event or condition." Id. (citing State v. Stout, 46 S.W.3d 689, 699 (Tenn. 2001); Gilley, 297 S.W.3d at 761). Third, the statement must have been made "while the declarant is under the stress or excitement from the event or condition." Id. The "ultimate test" under the third prong is "whether the statement suggests 'spontaneity' and whether the statement has a 'logical relation' to the shocking event." Id.

The qualifying startling event in this case was the shooting outside the declarant's home. The declarant's statements that he heard the shooting and describing the person he knew to be the shooter are related to the startling event. Further, the declarant called 911 soon after he heard the shooting and before police arrived at the scene. Accordingly, the trial court properly concluded that the declarant's statements in the fifth 911 call fell within the excited utterance exception to the rule against hearsay.

To the extent that the Defendant argues that the fifth 911 call was inadmissible because the State did not prove that the declarant had personal knowledge of the identity of the shooter, the Defendant has waived our consideration of that issue. The Defendant did not object to the admission of the fifth 911 call on the grounds that the declarant lacked personal knowledge and did not include lack of personal knowledge as a ground for relief in his motion for new trial. See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who

failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); see also Tenn. R. App. 3(e) ("[I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence . . . unless the same was specifically stated in a motion for new trial[.]").

Even though the issue is waived, we may review it for plain error. Tenn. R. App. P. 36(b). Plain error relief is "limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." State v. Adkisson, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994). In order to be granted relief under plain error, five criteria must be met: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the accused must have been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is "necessary to do substantial justice." Adkisson, 899 S.W.2d at 640-41; see also State v. Smith, 24 S.W.3d 274, 282-83 (Tenn. 2000) (Tennessee Supreme Court formally adopting the Adkisson standard for plain error relief). When it is clear from the record that at least one of the factors cannot be established, this court need not consider the remaining factors. Smith, 24 S.W.3d at 283. The defendant bears the burden of persuasion to show that he is entitled to plain error relief. State v. Bledsoe, 226 S.W.3d 349, 355 (Tenn. 2007).

In this case, the Defendant has failed to show that a clear and unequivocal rule of law was breached. He claims that there was insufficient proof to show that the declarant had personal knowledge of the Defendant's identity as the shooter. "The only competency requirement for an excited utterance under Rule 803(2) is that the declarant must have had an opportunity to observe the facts contained in the extrajudicial statement." State v. Land, 34 S.W.3d 516, 529 (Tenn. Crim. App. 2000). The trial court must determine "whether a witness had a sufficient opportunity to perceive the subject matter about which he or she is testifying." Id. However, "knowledge" under Rule 602 does not require "absolute certainty," and a declarant's personal knowledge "may be inferred from the statements themselves and the surrounding facts and circumstances." Id.

Here, there was sufficient evidence in the record for the trial court to infer that the declarant heard the shooting and then observed the shooter flee the scene. The declarant explicitly stated that he heard the shooting. He then told the 911 dispatcher that he knew the shooter because the same person had shot the declarant in the eye one year prior. Further, the declarant described the shooter as a short, light-skinned, black male who drove away in a maroon car. Such information was sufficient for the trial court to infer that the declarant had personal knowledge of the shooter's description based upon his observing the shooter flee the scene.

- 6 -

Additionally, the Defendant has failed to demonstrate that consideration of the issue is necessary to do substantial justice. Even if admission of the fifth 911 call was error, any such error was harmless. See Tenn. R. App. P. 36(b). The Defendant admitted that he was present at the scene and that he fired his gun at Mr. Kelso. Further, the declarant stated that he heard a shooting and described the shooter; he did not identify the Defendant by name in the 911 phone call. The Defendant has failed to demonstrate that reversal is necessary to do substantial justice. Adkisson, 899 S.W.2d at 640-41.

### *Evidence that Victim was the First Aggressor*

In a hearing outside the presence of the jury, the Defendant offered Tomeka Pennington's testimony as evidence that Mr. Kelso was the first aggressor in this case. Mr. Pennington testified that he knew the Defendant and that he was familiar with Mr. Kelso. Mr. Pennington recalled a time when he and the Defendant encountered Mr. Kelso and Mr. Kelso became aggressive. During that encounter, Mr. Kelso, who appeared to be intoxicated, approached Mr. Pennington and the Defendant and started "touching [their] pockets, trying to get in [their] pockets basically." Mr. Pennington stated that he had heard Mr. Kelso would try to "get high by any means." He also stated that Mr. Kelso could be a bully.

On cross-examination, Mr. Pennington stated that this encounter took place in July 2013. Mr. Kelso did not ask Mr. Pennington for anything as he approached. Instead, Mr. Kelso said, "[W]hat you got, what you got, you know I know you got something, come here, boy, come here[,]" and he was "[g]rabbing at [Mr. Pennington and the Defendant's] pockets." Mr. Pennington tried to prevent Mr. Kelso from touching him, but Mr. Kelso became more aggressive and grabbed Mr. Pennington's arms. Mr. Pennington "shrugged" off Mr. Kelso, and Mr. Kelso turned to the Defendant and touched him on the shoulder. The Defendant also "shrugged" off Mr. Kelso. Mr. Kelso then received a phone call and left the scene, and the Defendant "[r]un [sic] up the street." Mr. Pennington said he did not know the Defendant to be aggressive. He was not aware that the Defendant had shot a third party in the eye in the summer of 2012.

The trial court initially held that, if the Defendant wished to present testimony that the victim was the first aggressor, then such evidence would open the door for the State to introduce proof that the Defendant "had been the first aggressor in the past." The State argued that, if the Defendant was allowed to present evidence of Mr. Kelso's character for violence, then the State should be allowed to present the portion of the fifth 911 call in which the caller said the Defendant had previously shot him. In response, the trial court stated:

I really just kind of need to hear how his proof comes out on whether or not it opens the door to that rest of the 911 call that I excluded where the caller says, ["][I]t's the same dude that shot me last summer.["] That's a question I'm not sure I know the answer to that yet. I kind of need to hear how Mr. Pennington is going to testify.

However, after a short recess, the trial court held:

. . . This is a complicated issue because it involved 404(a), 404(b), and even 405. It talks about methods of proving character. And Mr. Pennington, he didn't—all he talked about was one single specific incident which would tend to make it 404(b) rather than 404(a) because he didn't say Mr. Kelso has a reputation in the community for being a bully. He didn't say that, didn't lay a foundation for his knowledge or anything like that, so I think it's probably more akin to 404(b). You can talk about specific instances of conduct in a self-defense case, but in a situation like this where you're—you are saying, you know, ["]I was afraid of this guy, he's been this aggressor in the past,["] then I think that does open the door for the State to prove the same character trait in [the Defendant].

Now, as to this phone call, I just have concerns about it. The person says in there—I admitted the phone call under excited utterance, but I think it's—it—it's character evidence, but it's akin to 404(b) character evidence because he's talking about a specific incidence of conduct, and I don't think that the Court can find from that phone call clear and convincing evidence that the other incident happened. So, although if Mr. Pennington testifies, it very well may open the door. I don't think it opens the door to that [sic] rest of that call being played. Now, the State may wish to bring in that person who made that call and say—talk about a specific incidence of conduct. I think that it—we'll have a hearing outside the jury and if the Court finds that clear and convincing and material, then it probably comes in, but I don't think the call comes in.

The trial court also reiterated that, if the Defendant presented evidence that Mr. Kelso had a reputation for bullying and aggression, then such testimony would open the door for similar testimony about the Defendant. The Defendant elected not to call Mr. Pennington to testify before the jury.

On appeal, the Defendant argues that the trial court erroneously analyzed Mr. Pennington's testimony under Tennessee Rules of Evidence 404(a) and (b). The Defendant asserts that he was merely offering Mr. Pennington's testimony to corroborate the Defendant's claim that Mr. Kelso was the first aggressor, not as substantive evidence.

The Defendant also contends that the trial court erred when it held that Mr. Pennington's testimony would open the door for the State to present the redacted portion of the fifth 911 call as evidence that the Defendant had been the first aggressor in the past. In his brief, the Defendant states:

> Particularly[,] the court would allow the State to introduce a 911 call where the caller alleged that [the Defendant] had shot him last summer. . . . Due to the ruling and the nature of the evidence the court ruled it would allow the State to introduce, the [Defendant] decided not to have Mr. Pennington testify.

The State argues that the trial court properly determined that Mr. Pennington's testimony would open the door for the State to present evidence of the Defendant's character. Further, the State contends that the Defendant is not entitled to relief because the trial court excluded the reference to the prior shooting in the fifth 911 call and that the record is silent as to what other rebuttal evidence the State may have presented if Mr. Pennington had testified.

Generally, "questions concerning the admissibility of evidence rest within the sound discretion of the trial court, and this [c]ourt will not interfere in the absence of abuse appearing on the face of the record." State v. Plyant, 263 S.W.3d 854, 870 (Tenn. 2008). A trial court abuses its discretion when it "applies an incorrect legal standard or reaches a conclusion that is 'illogical or unreasonable and causes an injustice to the party complaining.'" Id. (citing State v. Ruiz, 204 S.W.3d 772, 778 (Tenn. 2006)).

This court has previously stated that "[t]here is a distinction between evidence of prior acts of violence by the victim used to corroborate the defense theory that the victim was the first aggressor and that used to establish the defendant's fear of the victim." State v. Ruane, 912 S.W.2d 766, 779 (Tenn. Crim. App. 1995). If the defendant was unaware of the victim's prior violent acts, then the evidence is admissible for the sole purpose of corroborating the defendant's claim that the victim was the first aggressor. Id. at 779, 781. It cannot be introduced as substantive evidence under Tennessee Rules of Evidence 404(a)(2) and 405. State v. Warren Hildred, No. W2012-01032-CCA-R3-CD, 2013 WL 3329011, at *6 (Tenn. Crim. App. June 27, 2013), perm. app. denied (Tenn. Nov. 13, 2013). However, if the defendant "seeks to introduce evidence showing a reasonable fear of the victim, the defendant may testify to those violent acts perpetrated by the victim of which he or she is aware." Id. (citing Ruane, 912 S.W.2d at 779). Before evidence of a victim's prior violent acts can be introduced to corroborate the defendant's claim that the victim was the first aggressor, the following requirements must be met:

(1) the issue of self-defense must be raised by the proof and not simply the statements of counsel; (2) there must be a factual basis for the defendant's claim that the victim had first aggressor tendencies; and (3) the probative value of the evidence must outweigh the danger of unfair prejudice.

Id. at *7.

However, if a defendant places the victim's character at issue, the State may then "offer character evidence about the defendant to rebut the same." State v. Jason Allen Cobb, No. W2011-02437-CCA-R3-CD, 2013 WL 1223386, at *13 (Tenn. Crim. App. Mar. 26, 2013), perm. app. denied (Tenn. Oct. 16, 2013); see also State v. Pamela Taylor, No. W2012-02535-CCA-R3-CD, 2014 WL 4922629, at *45 (Tenn. Crim. App. Sept. 30, 2014), perm. app. denied (Tenn. Jan. 15, 2015) (stating "it is clear the Defendant 'opened the door' to proof of her character when she presented evidence that the victim was the first aggressor and that she had acted in self-defense when she fatally shot the victim[]"). The State may present rebuttal proof of the defendant's character in the form of reputation or opinion testimony. Tenn. R. Evid. 405(a); Pamela Taylor, 2014 WL 4922629, at *45. However, the State may cross-examine witnesses about specific instances of conduct if the following conditions are satisfied:

(1)[t]he trial court upon request must hold a hearing outside the jury's presence, (2) [t]he court must determine that a reasonable factual basis exists for the inquiry, and (3) [t]he court must determine that the probative value of a specific instance of conduct on the character witness's credibility outweighs its prejudicial effect of substantive issues.

Tenn. R. Evid. 405(a); see also Pamela Taylor, 2014 WL 4922629, at *45-46.

In this case, we first note that the trial court did not analyze Mr. Pennington's testimony under Tennessee Rule of Evidence 404 as the Defendant claims. Instead, the trial court stated that Mr. Pennington's testimony was "akin to 404(b)." Further, the trial court did not err when it held that Mr. Pennington's testimony would "open the door" for the State to offer evidence of the Defendant's character for violence. See Pamela Taylor, 2014 WL 4922629, at *45. Additionally, we note that, contrary to the Defendant's assertions, the trial court explicitly said that the State would not be allowed to rebut Mr. Pennington's testimony with the redacted portion of the fifth 911 call wherein the caller referenced the prior shooting. The State did not offer any other rebuttal proof or indicate what type of proof it may have offered if Mr. Pennington testified. The Defendant elected not to call Mr. Pennington to testify, and he cannot now assert that the trial court's ruling was in error when he clearly abandoned his efforts to introduce Mr. Pennington's testimony. See Warren Hildred, 2013 WL 3329011, at *7 (stating the defendant "cannot now be heard to complain about the exclusion of evidence when he

clearly abandoned his efforts to bolster [his] defense through the introduction of the evidence."). Moreover, the Defendant testified that Mr. Kelso had tried to bully him for some money one or two weeks before the offense. Therefore, even though he did not present Mr. Pennington's testimony, he was able to present evidence of the encounter to the jury. The Defendant has failed to show that the trial court abused its discretion, and he is not entitled to relief.

### III. Conclusion

For the aforementioned reasons, the judgments of the trial court are affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE